ROLLIN C. REYNOLDS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 97718, 98015. Promulgated April 29, 1941.

*Hugh Satterlee, Esq.*, and *I. Herman Sher, Esq.*, for the petitioner.
*J. R. Johnston, Esq.*, for the respondent.

350

OPINION.

LEECH: The following table gives effect to the corrections in the computation of the deficiencies in the deficiency notices which respondent concedes:

| | Withdrawals | Stock redemption | Total received |
|---|---|---|---|
| 1934 | $64,674.58 | | $64,674.58 |
| 1935 | 42,538.66 | $176,000 | 218,538.66 |
| 1936 | 29,371.38 | | 29,371.38 |

The first issue is whether the sums withdrawn by petitioner from R. C. Reynolds, Inc., in 1934, 1935, and 1936 were loans or dividends.

Withdrawals by petitioner during 1930 to 1933, inclusive, are treated by respondent as loans, while he seeks to characterize those occurring during the three following years as dividends.

The evidence reveals no reasonable basis for these opposite positions. It is obvious, however, that he is compelled to take such an inconsistent position in order to have any basis at all for his contention that

the withdrawals in the taxable years were dividends. If it were admitted that the withdrawals occurring in the earlier years were dividends, his present contention would fall because such dividends would be chargeable against earned surplus and there would be no earned surplus from which dividends could have been paid in the taxable years.

The withdrawals in dispute were treated on the books of the company as loans. Petitioner was charged with interest thereon at a rate varying from approximately 2½ to about 4 percent. Considering the period from 1931 to 1934, inclusive, as a whole, and giving effect to all credits reflected on the books of the company, including the item of the consideration for the transfer of petitioner's stock and contracts to the company in 1935, and properly attributing those credits first to interest (see *Helvering* v. *Drier*, 79 Fed. (2d) 501), $41,624.89, the total interest charged to petitioner was paid, together with $141,351.70 on account of his principal indebtedness.

Petitioner had the means of repaying these advances, consisting of assets other than this stock in the company. He intended to repay them. These advances bore no determinable relation either to earnings or surplus and no comparable withdrawals were made by other stockholders. In fact, the largest stockholder, Grace S. Reynolds, had credit balances with the company prior to and during the years here involved, on which the company paid her interest. Respondent attempts to discredit the veracity and character of petitioner by pointing out that he absented himself from the hearing after the second day; by the introduction of testimony on the part of certain employee-stockholders that they knew nothing of the loans; and by urging that there was no specific authorization by the stockholders or directors for such borrowings on the part of the corporation's president.

The age and physical condition of the petitioner, in our judgment, completely explain his absence from the witness stand after the second day of the hearing. We believe he is entirely worthy of credence.

So far as respondent's other contentions as to the advances are concerned, we find nothing seriously affecting their character as loans. Though it is true no specific authorization for them was made by the directors, the balance sheets of the company, disclosing fully these transactions between the petitioner and the company as loans, were approved by the directors at the close of each year. It is true, as respondent argues, that, under laws of New York passed in aid of creditors of corporations, loans to stockholders are forbidden. See Stock Corporation Law, ¶ 59; *Nellis Co.* v. *Nellis*, 16 N. Y. S. 545. But what engages us here is the actual conduct of the parties, not the legality of that conduct. *Stock Yards Bank of Cincinnati*, 25 B. T. A. 964.

It is our opinion that the advances to petitioner are what they purported to be—loans, and not dividends.  See *Albert Bettens*, 2 B. T. A. 535; *Kate C. Ryan, Executrix*, 2 B. T. A. 1130; *Pictorial Review Co.*, 5 B. T. A. 416; *Comey & Johnson Co.*, 8 B. T. A. 52; *Herman M. Rhodes*, 34 B. T. A. 212; reversed on other grounds, 100 Fed. (2d) 966; *Moses W. Faitoute*, 38 B. T. A. 32; *Wiese* v. *Commissioner*, 93 Fed. (2d) 921; certiorari denied, 304 U. S. 562, affirming 35 B. T. A. 701.

The next question is whether petitioner realized income upon the transfer of shares to R. C. Reynolds, Inc., in 1935 either under section 115 (g) of the 1934 Act[2] or under section 111.[3]   Although respondent advances possible liability under section 111 as an alternative position, we consider it first, in order to present more clearly the 1935 transaction.   As is noted below, the amount which respondent seeks to tax to petitioner is not the same under both contentions.

Petitioner wanted key employees to own stock in the business. Respondent argues that stock was never sold to the employees, but that they were merely given equities through what were nothing more than conditional sales contracts.   Hence, he says, petitioner's basis for the 1,340 units transferred to the company in 1935 was their original 1920 cost to petitioner, not the price which petitioner paid for them in the alleged "reacquisition" from employees who wished to surrender their rights to stock.   This 1920 basis, he contends, was decided to be $92.37 per unit in *Reynolds* v. *Durey*, which fact is therefore *res judicata* in this proceeding.   It is thus respondent's position that petitioner was in receipt of gain in the 1935 transaction measured by the difference between what he received ($100 per unit) for the 1,340 units of stock and the cost basis of $92.37 per unit.

---

[2] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

\* \* \* \* \* \* \*

(g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

[3] SEC. 111. DETERMINATION OF AMOUNT OF, AND RECOGNITION OF, GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 113 (b) for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received.

(c) RECOGNITION OF GAIN OR LOSS.—In the case of a sale or exchange, the extent to which the gain or loss determined under this section shall be recognized for the purposes of this title, shall be determined under the provisions of section 112.

(d) INSTALLMENT SALES.—Nothing in this section shall be construed to prevent (in the case of property sold under contract providing for payment in installments) the taxation of that portion of any installment payment representing gain or profit in the year in which such payment is received.

The agreements by which the employees acquired stock in the company provided that the stock should be issued in the name of the purchaser, that dividends declared thereon should be applied toward the purchase price, that interest should be paid to petitioner on the balance due, that the employee should endorse his stock in blank and give it to petitioner as collateral security for full payment of the price, and that each agreement should terminate in five years. As to the last condition it is apparent from the record that neither of the parties to these agreements regarded them as terminated at the end of five years. Petitioner testified without contradiction that he repurchased stock from dissatisfied employees entirely without regard to any contractual obligations in that respect. This course of dealing by the parties to the contracts in effect established new agreements at variance in that particular with the terms of the original understanding. *Gibbs-Preyer Trust #1*, 39 B. T. A. 492. As to whether the original agreements embodied sales of stock to employees, we are convinced they did. Title passed to each buyer, who thereafter included the dividends on his shares in his tax returns, and pledged his shares to petitioner by way of security. The rule is well stated in 4 Williston on Contracts (Rev. Ed.) ¶1044: "* * * there seems no reason why one should hesitate to say that a pledgee merely has possession of the goods coupled with a power to sell them on default by the pledgor, but the latter retains the ownership subject to a lien to the extent of the debt enforceable by exercise of the power of sale * * *." See also *Lewis* v. *Mott*, 36 N. Y. 395; *First Trust & Deposit Co.* v. *Potter*, 278 N. Y. S. 847; *Cole* v. *Manufacturers' Trust Co.*, 299 N. Y. S. 418.

In view of these considerations, it is our opinion that petitioner sold this stock to employees and repurchased it from some of them for the same price at which it had been sold ($100 per unit). If as respondent well argues alternatively, the reacquisition of this stock by the company in 1935 was a purchase by the company from petitioner, then it follows that petitioner realized no gain under section 111. This result renders it unnecessary to pass on the question of whether *Reynolds* v. *Durey* is *res judicata* of any fact material in this proceeding.

Respondent's principal contention with respect to petitioner's 1935 transaction with the company is that it was a cancellation or redemption of stock essentially equivalent to the distribution of a taxable dividend under section 115 (g) of the Revenue Act of 1934. Respondent charges petitioner with having so received the amount of $176,000. This includes $134,000 which the company paid petitioner for the stock he had repurchased from employees; $12,971.62 which was the unpaid balance on petitioner's sales of stock to employees under con-

tracts assigned to the company; and $29,028.38 which petitioner had already received from the employees on those contracts.

On brief respondent urges that there was "camouflage" and "manipulation" of the corporation's books and apparently takes the position that the corporation could neither have "redeemed" nor "purchased" the stock because it did not comply with the provisions of its charter to the effect that the preferred stock was subject to purchase in whole or in part at $110 per share plus accumulated dividends.

We agree with petitioner that the company might repurchase its stock otherwise than in accordance with the provisions in its charter and that the charter provision was inserted only to force the preferred stockholders to sell on the terms indicated if the company so desired. It is entirely permissible for a corporation to purchase its own stock by mutual agreement with the seller under these circumstances. *Laue v. Bethlehem Steel Corporation,* 276 N. Y. S. 173.

In order that section 115 (g) may be applied, the company must have (1) canceled or redeemed petitioner's stock and (2) that cancellation or redemption must have occurred "at such time and in such manner" as to be "essentially equivalent to the distribution of a taxable dividend." Here, significantly, the reacquired stock was not retired. It was retained as treasury stock. No reduction of authorized stock was ever authorized. The reacquisitions were not pro rata from all stockholders, but were limited to the stock of the employees and that which petitioner had repurchased from them. Cf. *James D. Robinson,* 27 B. T. A. 1018; affd., 69 Fed. (2d) 972. The corporate resolution under which these reacquisitions occurred does not, in the face of the other facts, characterize them as in redemption or cancellation of stock. In short, it seems doubtful that these reacquisitions were such at all. They may well have been merely sales of stock to the company. *William A. Smith,* 38 B. T. A. 317; *W. C. Robinson,* 42 B. T. A. 725. Cf. *Benjamin R. Britt,* 40 B. T. A. 790; affd., 114 Fed. (2d) 10.

However, assuming the reacquisition of this stock from petitioner was a redemption or cancellation of his stock, the question remains, did it occur "at such time * * * [as to be] essentially equivalent to the distribution of a taxable dividend"? We think not.

Obviously, there was no connection between the issuance and redemption or cancellation of this stock. None of it had been issued as a stock dividend. Though originally issued to petitioner, the affected stock had been sold to key employees to retain their services and had been repurchased from them for their relief for the same price at which it had been sold to them. These repurchases occurred during a period beginning in 1922—long before the reacquisition of the stock by the company at the same prices. This reacquisition was not prorated among the stockholders. Only the petitioner and such employees as desired were included. And, of emphatic importance, when the com-

pany reacquired petitioner's stock, he owned less than 50 percent of the outstanding stock. Cf. *E. M. Peet*, 43 B. T. A. 852. No artifice is revealed here. By this transaction, petitioner actually disposed of an interest in the company measured by the percentage of the stock he relinquished. Cf. *J. Natwick*, 36 B. T. A. 866. The redemption or cancellation, if such it was, was therefore not "at such time * * * [as to be] essentially equivalent to the distribution of a taxable dividend." *Commissioner* v. *Brown*, 69 Fed. (2d) 602; *Commissioner* v. *Babson*, 70 Fed. (2d) 304; *Commissioner* v. *Cordingley*, 78 Fed. (2d) 118; *Commissioner* v. *Quackenbos*, 78 Fed. (2d) 156; *Kelly* v. *Commissioner*, 97 Fed. (2d) 915; *Patty* v. *Helvering*, 98 Fed. (2d) 717.

This discussion and conclusion have directly to do with the $134,000 item which was the credit petitioner received from the company in 1935 for the stock it then acquired from petitioner.

However, the same result, we think, follows as to the item of $29,028.38 which constituted the sum already received by petitioner on his contracts of sale with employees when those contracts were assigned to the company, and to the item of $12,971.62, the balance unpaid on those contracts, which was credited by the company to petitioner in that year upon his assignment of those contracts to it.

The item of $29,028.38 was received in earlier years, not from the company, but from employees on account of the purchase price of stock which we have already decided was sold by the petitioner to those employees. The title to that stock passed to those purchasers in those prior years. Petitioner did not own this stock in 1935. It was not then canceled or redeemed. Nor did the company acquire it. All the company then acquired was petitioner's rights under his contracts with the employees, which included the right to receive that unpaid balance on this stock from the purchasing employees. Obviously, therefore, neither of those items is taxable to petitioner under section 115 (g), *supra*.

The last issue is whether petitioner may deduct the interest charged by the company on his indebtedness for 1934 and 1935. Petitioner's books were kept on the cash basis. His salary was not paid to him by check, but was credited to his account on the books of the company. Nevertheless he included it in his taxable income for both years, in the amount of $10,000 for each year. On the books of the company, petitioner's account was debited with interest charges for those years in the respective amounts of $10,110.09 and $6,445.32. We may assume that his salary was credited directly against these interest charges, for such is the proper practice. *Shepard* v. *City of New York*, 216 N. Y. 251; 110 N. E. 435; *When Clothing Co.*, 1 B. T. A. 973. Although it is true that certain entries in Reynolds' loan account with the company prior to 1931 are not satisfactorily explained, we are satisfied that the account, as to the taxable years, fairly represents

the true situation, namely, advances to Reynolds upon which interest was charged and upon which he repaid interest and principal from time to time. It is our conclusion that interest in the amounts charged him by the company was paid by petitioner in each year by a method entirely consistent with the cash system of accounting and that the deduction is allowable. Cf. *Barto Co.*, 21 B. T. A. 1197. For 1934, the excess of interest charged over salary credited, $110.09, should be disallowed, there being no showing that payment of this excess was made during the taxable year.

*Decision will be entered under Rule 50.*

*Hugh Satterlee, Esq.*, and *I. Herman Sher, Esq.*, for the petitioner. *J. R. Johnston, Esq.*, for the respondent.