Frank W. Sharp v. Commissioner. Lucille Sharp v. Commissioner.
Frank W. Sharp v. Commissioner
Docket Nos. 33405, 33406.
United States Tax Court
1953 Tax Ct. Memo LEXIS 171; 12 T.C.M. (CCH) 836; T.C.M. (RIA) 53255; July 20, 1953
*171 Whitfield H. Marshall, Esq., 12th Floor, Second National Bank Building, Houston, Tex., and Clarence E. Kendall, Esq., for the petitioners. M. Clifton Maxwell, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent in these proceedings determined deficiencies in petitioners' income tax for the years 1945 and 1946 as follows: Docket
No.
Petitioner
Year
Deficiency
33405
Frank W. Sharp
1945
$ 5,727.81
1946
$14,781.12
33406
Lucille Sharp
1945
$ 5,727.81
1946
$14,781.12
The sole issue for decision is whether in the years 1945 and 1946 certain amounts charged to petitioner, Frank W. Sharp, on the books of Housing, Inc., a corporation, all the stock of which was owned by him, constituted loans to petitioner as he contends, or, as determined by respondent, were corporate dividends taxable as income to petitioners, under section 115 (a), I.R.C.
Other adjustments in the deficiency notices are not contested by petitioners. Respondent's "alternative plea" in his brief is not properly before the Court and cannot be considered. It seeks to increase the deficiency *172 for 1946 and injects another and different ground of tax liability to that contained in the notices of deficiency, which requires as its basis an affirmative pleading by respondent. Over three months after the hearing, respondent, for the first time, asked leave to file an amended answer containing allegations relating to his proposed alternative plea, which motion to file, not being seasonably made, was denied. Findings of Fact Some facts were stipulated and are so found. Petitioners are husband and wife, residing in Houston, Texas, and all property and income here involved was their community property under Texas law. They filed separate income tax returns for 1945 and 1946 with the collector of internal revenue for the first Texas district. Petitioner in the singular herein refers to Frank W. Sharp. Since 1936 petitioner has been engaged in the business of real estate development, residential and commercial construction and related industries. At all times here material his principal construction business was conducted as a proprietorship under the name of Frank W. Sharp Construction Company. The housing shortage during the war and thereafter caused petitioner to expand *173 his activities. From 1942 to 1947 he was active in the formation of a number of corporations, in each of which he was a principal stockholder and an active participant in the management. These companies were variously engaged in the business of real estate development and management, residential and commercial construction, manufacture and sale of building materials and related activities. In each case the particular company was formed by the petitioner and his associates as a vehicle to carry out a particular project or type of enterprise. The device of separate corporations was adopted in order to limit the liability of the stockholders to their investment in each and also to provide a device by which an experienced man could be put in charge of each venture under an agreement whereby he could obtain stock in the corporation carrying on the project. From time to time, petitioner, as Frank W. Sharp Construction Company, performed substantial construction work for many of the corporations in which he was interested, as well as for unrelated persons and corporations. Of the corporations referred to, the first to be formed, and the one principally involved herein, was Housing, Inc. *174 , hereinafter called "Housing," which was incorporated in July, 1942, under the laws of Texas with an initial capital of $10,000. By successive stock increases the corporation's capital reached $140,000 in 1944 and was reduced to $20,000 in 1946. At all times all of the stock of Housing was beneficially owned by petitioner. Housing was liquidated in December, 1947. The charter of Housing authorized it "* * * to erect or repair any building or improvement * * * to purchase, sell and subdivide real property * * * and to accumulate and lend money for that purpose." The specific object of its formation, however, was to construct and own houses financed under the war housing provisions of the Federal Housing Act. The houses were to be built in Industrial Addition, a new subdivision near the City of Houston, convenient to a number of war industry plants then being constructed. Industrial Addition later was incorporated as Jacinto City, Texas. The arrangement for building the houses was as follows: Housing was to buy lots in Industrial Addition and, as to each lot, secure a commitment from the Federal Housing Administration (hereinafter called "FHA") to insure the mortgage covering the lot *175 and the house to be constructed thereon. In order to meet FHA requirements, Housing was then to make a contract with petitioner for construction of the house at a fixed price, such contract providing for final payment to the petitioner upon inspection and acceptance by FHA representatives, at which time Housing was to obtain a loan on the house and lot, insured in accordance with its commitment from the FHA. Shortly after its incorporation, Housing secured FHA commitments with respect to 100 houses, and petitioner commenced construction of such houses under the arrangement set out above. As work progressed, Housing made construction advances to petitioner and made payments on behalf of petitioner to lumber companies and other subcontractors of petitioner. As such advances and payments were made, the amounts thereof were debited to petitioner's account on the books of Housing. Upon petitioner's completion of houses, his account was credited with the full amount of petitioner's contract price of such houses. Shortly after the 100 house commitment was obtained, Housing secured commitments on 28 additional houses and, later, on 200 additional houses, making a total (with the initial *176 100 houses) of 328 houses. Petitioner proceeded with the construction of all of these houses and completed them in the first part of 1944. During 1943 Housing had secured commitments on an additional 400 houses (making 728 houses in all) and petitioner began construction thereon. Neither the petitioner nor Housing, however, had sufficient funds to complete the 400 house group without financial assistance. In order to obtain the necessary capital, Housing obtained a "V Loan" through the Federal Reserve Bank, and, under the terms of the loan, Housing was required to do substantially all of the construction work. In order to comply with this requirement, Housing bought the petitioner's inventory, equipment and tools and took over all construction activities of the petitioner in Industrial Addition. Petitioner's account with Housing was, accordingly, credited with his costs in the 400 house group and with the cost of his inventory and other items purchased by Housing. Construction of such houses was completed by Housing in July, 1945. In 1942 and 1943 Housing obtained construction contracts on certain projects unrelated to the Industrial Addition development. Such contracts were performed *177 by petitioner during 1942 and 1943 under subcontracts with Housing, resulting in numerous debits and credits to petitioner's account on Housing's books. The account reached a debit balance of over $600,000 in November, 1943, but had been reduced to about $161,000 at December 31, 1943, as the result of credits on account of completions of houses and Housing's assumption of construction of the 400 house group as described above. Under Title VI of the Federal Housing Act, the houses owned by Housing were required to be held and rented for at least a year after completion. As houses became eligible for sale most of them were placed on the market. Many house sales were handled for Housing by petitioner's organization (Frank W. Sharp Construction Co.) on the basis of the same commission paid by Housing to regular real estate agents. Petitioner's commissions thus earned were credited by Housing to his account as follows: December 31, 1943, $22,750; June 30, 1945, $15,450; June 30, 1946, $11,550. After July 1945, all houses constructed by Housing being completed, its principal business was renting and selling houses. Most of the sales were on the installment plan whereby Housing retained *178 title until the purchaser by payments obtained sufficient equity to secure a loan elsewhere and thereby release Housing from liability under its loan on the property. While the houses were being rented and sold by Housing, petitioner performed maintenance and repair work thereon, and debits and credits to petitioner's account resulted therefrom. The number of houses owned and sold by Housing from July 1, 1946, to December 28, 1947 (date of liquidation) were as follows: Houses
Houses
owned
sold
beginning
during
Period
of period
period
7-1-46 to 12-31-46
236
120
1-1-47 to 6-30-47
116
44
7-1-47 to 12-28-47
72
66 *
Through 1943 most of the debits and credits to petitioner's account on Housing's books arose from construction work being performed by petitioner for Housing in Industrial Addition. During 1944 petitioner constructed a number of apartment units for Third Avenue Corporation, of which petitioner was a principal stockholder. In order to finance this construction petitioner borrowed money from Housing, and Housing also paid some accounts *179 of petitioner incurred therein. Thereafter and through 1947, petitioner was not only carrying on his own construction business but was financially involved in a number of companies carrying on various real estate and related projects. From time to time the petitioner, or one of the corporations in which he was interested, would not have sufficient funds to provide for the current expenses of a particular project or to make advantageous purchases of supplies and equipment anticipated to be needed in the future. In many such cases the petitioner would borrow funds from Housing in order to provide financial assistance to other projects in which he was interested. From time to time, petitioner would make repayments to Housing on account of such loans, by cash payments to Housing, by paying off its debts, or by other transactions entitling petitioner to credit on his account. In 1944 petitioner purchased 32 acres of land in a Houston residential area with the idea of later transferring it to Housing for development when Housing had the money to carry out the development. He spent considerable time and expense in developing plans for its development and the types of houses to be erected *180 thereon. In 1946 he had it platted into residential lots and streets as the David Crockett Subdivision. For some time prior to January 1, 1947, FHA had been insisting that petitioner pay what he owed Housing, to protect its FHA loans. Also at about the end of 1946 petitioner decided that he wanted to clear up his inter-company accounts. Accordingly, petitioner instructed his bookkeeper to transfer to Housing the David Crockett land plus such accounts receivable as might be required to pay in full what he owed Housing. He left to his bookkeeper and accountant ascertainment of the amount he owed Housing and also selection of the accounts receivable to be transferred in payment thereof. Petitioner had no bookkeeping knowledge and his time was so engrossed with the supervision of his numerous projects that he necessarily left accounting details to them. Petitioner's business had grown so rapidly that he lacked a staff of competent employees. His bookkeeper was not a well trained bookkeeper, and an accountant was used for assistance on special matters. Pursuant to petitioner's above instruction, his bookkeeper upon advice of his accountant made entries under date of January 1, 1947, on *181 the books of Housing crediting petitioner's account therein with a total of $219,033.45, reflecting the transfer by petitioner to Housing of the David Crockett land at an amount of $73,784.33 (which was less than its then fair market value), and the following accounts receivable: Commercial Realty Co., Inc.
$49,978.23
Industrial Road Equipment Co.
23,966.19
Third Avenue Corp.
43,141.88
Albert Thomas
28,162.82 This $219,033.45 credit to petitioner's account resulted in a credit balance therein. The first two accounts above listed were valid and regular. The Industrial Road Equipment account was paid in full by cash to Housing in 1947. Commercial Realty made a cash payment to Housing in 1947 of $30,000 and the unpaid balance was, upon liquidation of Housing in December 1947, transferred to petitioner and was subsequently paid to him. The Third Avenue Corporation and Albert Thomas accounts represented originally losses on construction contracts sustained by petitioner in prior years. During 1946, an internal revenue agent advised that he was disallowing these losses, and petitioner's bookkeeper and accountant decided that if the losses were not deductible by *182 petitioner, they should be deductible by Housing since it had made advances in connection with the performance of the contracts on which the losses were sustained. Under this theory, such advances, which had been charged to petitioner's account, should be eliminated therefrom and treated as direct investments by Housing in the construction projects involved. Accordingly, the bookkeeper and accountant set up the losses on petitioner's books as accounts receivable and immediately transferred them to Housing as a credit on petitioner's account. Petitioner did not have anything to do with the aforesaid handling of the items in question and, so far as he knew, the accounts receivable thus set up were good and valid. In August 1947 petitioner arranged for Housing to borrow $50,000 on the David Crockett land, but when he went to close the loan the title company discovered the record title was still in his name. His bookkeeper had failed to prepare the deed as petitioner had instructed him to do. Petitioner believed the deed had been executed. Confirming this belief, Housing in its income tax return for the year ended June 30, 1947, included this land in its balance sheets as one of its *183 assets. Furthermore, on March 31, 1947, petitioner in a financial statement made to his bank for credit purposes did not include this land as his individual asset. When he discovered the title to the land was still in him, he secured the loan in his own name and applied the proceeds therefrom to the payment of notes owing by Housing. In 1947. petitioner realized that he was losing money in constructing houses. He thereupon shut down all of his construction work and decided to confine himself thereafter to the development of subdivisions and the sale of lots. His plans with respect to Housing had always involved the building of houses in the David Crockett Addition, and with his decision not to do any more house construction, there was no longer any reason for continuing the existence of Housing. Accordingly, in December, 1947, the remaining houses owned by Housing and its remaining contracts of sale were sold, and its assets were distributed in complete liquidation to petitioner who assumed Housing's existing liabilities. Petitioner considered all advancements made to him by Housing as loans which he intended to repay. All such transactions were carried on his books as accounts *184 payable to Housing and were carried on Housing's books as accounts receivable from petitioner. For credit purposes both petitioner and Housing, during the taxable years, furnished the Houston bank with which they both did business with copies of their financial statements. Those furnished by petitioner reflected his indebtedness to Housing as an account payable, and the statements furnished by Housing reflected petitioner's indebtedness to it as an account receivable. In considering the financial position of Housing the bank recognized petitioner's account as an asset of Housing; and in considering the financial position of petitioner, the bank recognized such account as a liability of petitioner. Substantially all sums borrowed by petitioner from Housing were used by him for business purposes and not for personal expenses. At all times here material petitioner had assets, in addition to his stock in Housing, of a value largely in excess of his indebtedness to Housing, and he had the financial ability at all times to repay same. Notes were not given by petitioner to Housing for any sums he obtained from it, nor was interest charged therefor. Housing never declared a dividend. *185 Following is a summary of petitioner's accounts on the books of Housing for the years 1945 and 1946, showing total charges and credits during each month and the balance at the end of each month. This summary eliminates correcting entries as explained in the notes. Debit or
(credit)
Debit
Credit
Balance
Balance
Dec. 31, 1944
$147,268.41 (1)
1945-Jan.
$ 3,234.07
$ 6,775.99
143,726.49 (2)
Feb.
2,274.01
13,802.68
132,197.82
March
11,021.00
17,048.03
126,170.79
April
6,316.88
646.00
131,841.67
May
7,207.49
385.48
138,663.68
June
1,266.57
21,465.00
118,465.25 (2)
July
1.40
118,463.85
Sept.
5,044.36
565.69
122,942.52
Oct.
7,078.38
115,864.14
Nov.
115,864.14
Dec.
10,107.54
129.20
125,842.48
Total-
1945
$46,471.92
$67,897.85
1946-Jan.
$ 47.35 $
125,889.82
Feb.
3,160.52
6,018.90
123,031.45
March
3,000.00
1,200.00
124,831.45
April
45.04
124,786.41
May
37,633.87
1,341.98
161,078.30 (3)
June
13.48
12,663.38
148,428.40 (4)
July
1,340.20
147,088.20 (4)
Aug.
22.92
147,111.12
Sept.
11.05
147,100.07 (5)
Oct.
448.30
147,548.37
Nov.
147,548.37
Dec.
1,800.00
149,348.37 (1)
Total-
1946
$46,126.44
$22,620.55
*186 (1) Eliminates $30,000 charged to petitioner on capital stock increase, February 1943; reversed December 12, 1946. (2) Eliminates $40,000 of credit for purchase of water plant; corrected in June 1946. (3) Includes $10,352.52 charged to Frank W. Sharp, general ledger account. (4) Eliminates $3,000 charge on account of Third Avenue Corp. stock; reversed in July 1946. (5) Eliminates charge of $15,450 reversing commissions credited in June 1945; this item restored in June 1947. In respondent's notice of deficiency it was determined "that withdrawals" in the amount of $15,194.42 in 1945 and $46,072.87 in 1946 by petitioner from Housing were "taxable income as dividends", and in his computations the taxable income was increased by these amounts. The notices of deficiency did not enumerate the items comprising the amounts of withdrawals therein determined as dividends, but the stipulation of facts recited that the following debit entries on Housing's books of petitioner's account constituted such items: For the Year 1945
Sept. 15
F. W. Sharp Const. Co. - Loan
$ 5,000.00
Petty cash paid out - telephone
44.36
$ 5,044.36
Dec. 28
Wilmeth Paint Stores paid by F.W.S.
74.64
Dec. 28
Utilities 1.79; 3.55; 8.77
14.11
Dec. 28
Telephone S. B. Talco, paid by F.W.S.
18.79
Dec. 29
F. W. Sharp Const. Co. - Loan
9,000.00
Dec. 29
F. W. Sharp Const. Co. - Loan
1,000.00
$10,107.54
Telephone (charged on book 2/1/46)
42.52
$15,194.42
For the Year 1946
Jan. 12-31
John Wilmeth Paint Stores
$ 47.35
Feb. 1
To transfer J. I. Jackson acct. to F.W.S. book
$ 18.00
Feb. 2
F.W.S. Const. Co. - Loan
1,500.00
Feb. 26
John N. Eddy, Jr. Oregon Lbr. Mill Ck - chg. acct. John
Eddy
1,600.00
$ 3,118.00
Mar. 7
L. H. Jolley stock in 3rd Ave. Corp.
3,000.00
May 4
Frank Sharp Const. Co. - Loan
$ 4,000.00
May 4
F. W. Sharp Const. Co. - Loan
1,500.00
May 31
City National Bank
7,000.00
May 31
Frank Sharp Const. Co. - Nat'l Bank Comm.
14,781.35
$27,281.35
June 18
Charge F.W.S. with collection of Kerbow A/c Rec.
13.48
Aug. 27
Charge to F.W.S. for credit memo.
22.92
Oct. 25
Sales of 2 office machines
437.25
Dec. 6
Advance to F.W.S.
1,800.00
May 27
Douglas McGregor Ck. #1109 - $5,705.03 to be divided between
Ben Taub and Frank Sharp
$ 2,852.52
May 27
Douglas McGregor $15,000.00 (Ben Taub $7,500.00 - F.W.S.
personal $7,500.00)
$ 7,500.00
$10,352.52
Total
$46,072.87
*187 All of the amounts withdrawn by petitioner from Housing during the years 1945 and 1946 were loans and not dividends. Opinion The issue presented is purely factual. Were the amounts withdrawn by petitioner from Housing, of $15,194.42 in 1945, and of $46,072.87 in 1946, dividend payments to petitioner, as respondent has determined, or were they loans as petitioners contend? By section 115 (a) of the Internal Revenue Code a dividend is defined to be any distribution made by a corporation to its shareholders out of earnings or profits. There being no question that the amounts in controversy were from earnings and profits, they will be deemed dividend distributions, unless the evidence establishes their character as loans. The record is voluminous. In our findings of fact we have quoted at length and in detail therefrom, and deem it unnecessary to review or repeat same. Based thereon, and after considering all of the evidence and the record as a whole, we have found as an ultimate fact that the withdrawals in question were loans and not dividends. All withdrawals by petitioner from Housing during 1942 to 1944, inclusive, which were numerous in number and *188 substantial in amounts, are treated by respondent as loans, as were also some of those made in 1945 and 1946. While here, as a basis of this proceeding, respondent has arbitrarily selected certain withdrawal items in 1945 and 1946 which he has characterized as dividends. As in Rollin C. Reynolds, 44 B.T.A. 342, "the evidence reveals no reasonable basis for these opposite positions". Contrary to the respondent's determination the evidence, when considered as a whole, reveals that all withdrawals by petitioner from Housing, without exception, were in the same category, they were part and parcel of the debit and credit system used by petitioner in transactions between him and Housing. Sometimes one was the lender and the other the borrower, and sometimes the reverse was true. That there was during the taxable years a bona fide relation of debtor and creditor between petitioner and Housing there can be no doubt. The advancements by Housing to petitioner were not a one way street. Petitioner made many advancements to Housing, probably as many and in number possibly more than Housing made to him. The account between them was exceedingly active during the period from 1942 to *189 1946, inclusive, and the books of petitioner, and also those of Housing clearly and meticulously reflected each and every debit and credit to which each was entitled. There appeared hundreds of entries showing debits and credits which arose in the ordinary conduct of business dealings between petitioner and Housing typical of the varied business transactions in which petitioner, Housing and his other corporate associates were engaged. Not only were the withdrawals in dispute treated on the books of Housing as loans, but petitioner at all times regarded them as loans, and intended to repay them. Petitioner at all times had the means of repaying them from assets other than his Housing stock, and in December, 1946, he instructed his bookkeeper to transfer certain land and accounts sufficient in value to pay same in full, but due to the negligence of his bookkeeper and accountant, this order was not completely carried out at that time. Strongly corroborating petitioner's contention that the withdrawals in question were loans, and that he so regarded them, and that a bona fide relation of debtor and creditor existed between petitioner and Housing is the fact that during the taxable *190 years both petitioner and Housing, in credit statements separately made to the Houston bank with which they did business, correctly and accurately revealed the existence of the indebtedness between them. This not being a 102 case, the failure of Housing to declare dividends is not specially significant. Further, respondent's contention that the debt is not evidenced by a promissory note does not impress us. It is well known that in the business world corporations and firms closely related and having numerous and frequent transactions between them (as is here the case) depend upon open accounts to determine the state of their indebtedness. If a bona fide relation of debtor and creditor exists between them, the balance due from one to the other is a debt. No two cases are exactly alike, but among those sustaining our holding here are Rollin C. Reynolds, supra; Moses W. Faitoute, 38 B.T.A. 32 and Herman N. Rhodes, 34 B.T.A. 212. We have examined the cases cited by respondent, but under the facts of each they are distinguishable and not applicable here. The respondent's determination that the amounts in question were dividends and not loans *191 is reversed. Decisions will be entered under Rule 50. Footnotes
*. Not including 6 houses sold to Commercial Realty Co. just prior to liquidation of Housing.↩