H. C. Thorman v. Commissioner. Nina L. Thorman v. Commissioner.
H. Thorman v. Commissioner
Docket Nos. 31431, 31432.
United States Tax Court
1953 Tax Ct. Memo LEXIS 137; 12 T.C.M. (CCH) 963; T.C.M. (RIA) 53287; August 27, 1953
*137 Leon O. Lewis, Jr., Esq., 1709 Transit Tower, San Antonio, Tex., for the petitioners. John P. Higgins, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent has determined deficiencies in income tax as follows: Docket
No.
Petitioner
Year
Deficiency
31431
H. C. Thorman
1944
$ 173.50
1945
13,178.25
1946
11,729.25
31432
Nina L. Thorman
1944
633.51
1945
13,959.58
1946
12,266.39
The issues in these proceedings are (1) whether transactions with, and for a closely held corporation constituted debts or income to petitioners, and (2) in the alternative, if the transactions were taxable to petitioners were they taxable as a liquidating dividend. Findings of Fact The stipulation of facts is hereby adopted by reference. H. C. Thorman and Nina L. Thorman, husband and wife, reside in San Antonio, Texas. They filed separate returns for the years 1944, 1945 and 1946 with the collector of internal revenue for the first district of Texas. H. C. Thorman will hereinafter be referred to as petitioner. Petitioner was engaged in the real estate business for the greater part *138 of his life. He managed and developed property, built houses, and was a real estate salesman and collection agent for various clients. Northside Investment Company (hereinafter referred to as Northside), was incorporated under the laws of Texas in 1927. Its capital stock consisted of 480 shares of $100 par value per share. The principal activity of Northside was the development of Olmos Park Estates, a residential subdivision. Northside also developed two other areas known as Park Place and Olmos Park Terrace. Northside did not build any homes on these subdivisions. Northside originally divided the Olmos Park Estates into 579 lots. On December 31, 1945, only 29 lots remained to be sold. Petitioner in 1927 held 25 per cent of the Northside stock and in subsequent years he acquired all of its outstanding stock. Petitioner was president and manager of Northside during the life of the corporation. Northside carried on its books an open account in petitioner's name. A summary of this account as shown at the end of each calendar year is as follows: Balance
Year
Debit
Credit
1938
$ 4,467.72
1939
26,567.71
1940
$ 436.28
1941
34,357.65
1942
36,592.54
1943
54,160.92
1944
16,921.53
1945
38,808.23
1946
81,760.54
1947
83,359.04
*139 When petitioner sold corporate realty, he retained the proceeds from the sale. A debit entry in the amount retained was then entered in his account on Northside's books. Conversely, when he paid corporate taxes, operating or maintenance expenses, a credit entry was made in the amount he paid out of his own pocket for the corporation. This account reflected the balance due to or from petitioner. He also made entries on his individual books reflecting the transactions with Northside so that his books reflected the same balance due to or from Northside. The balance of $81,760.54 shown on the books of Northside to be due from petitioner on December 31, 1946, was determined by respondent to be income to the petitioner. This sum was made up of $38,808.23 in 1945 and $42,952.31 in 1946. The account due from petitioner to Northside was cancelled on December 8, 1948, the date on which petitioner received all of the assets of Northside in liquidation of his stock in the company. In February 1945, at the annual meeting of the shareholders, it was pointed out that the real estate interest of Northside was dwindling, and that it would be to the best interest of all for the corporation to be *140 dissolved. Later the directors of Northside in their meeting took cognizance of the shareholders' discussion on liquidation. After these meetings no other property was acquired for development by Northside. On December 8, 1948, the directors passed a resolution whereby all the assets of Northside were transferred to petitioner in cancellation of all outstanding stock in the corporation. Petitioners reported in Schedule D of their 1948 income tax return a long-term capital gain of $82,859.65 from the liquidation. The gain was computed as follows: ASSETS RECEIVED IN LIQUIDATION
Cash
$62,872.62
Account Receivable -
H. C. Thorman
83,359.04
Notes Receivable
7,764.65
Accrued Interest on
Notes
97.21
Real Estate: Olmos Park Estate
Lots: Lot 24, Block 1
2,500.00
Lot 23, Block 3
3,000.00
Lot 11, Block 18
4,000.00
Lot 13, Block 18
4,000.00
Lynwood Addition: Lot 40, Block 2
40.00
Total Value of Assets Received
$167,633.72
Less: Liabilities Assumed
9,374.07
$158,259.65
COST OF STOCK
120 Shares Acquired
in 1927
$12,000.00
120 Shares Acquired
in 1930
32,400.00
120 Shares Acquired
in 1936
31,000.00
75,400.00
Net Gain from Liquidation
$82,859.65
*141 The item of "Account Receivable - H. C. Thorman" in the amount of $83,359.04 shown above includes the amount of $38,808.23 determined by respondent to be income to petitioner and his wife in 1945 and the amount of $42,952.31 determined to be income to them in 1946. Petitioner was financially able to pay Northside the balance of $81,760.54 which was due on December 31, 1946. The 1945 and 1946 debit balances in petitioner's open account on Northside's books were the result of his debtor-creditor relationship with Northside, and the sums indicated therein were not income to him in those years. Opinion Petitioner contends that his transactions with Northside, and the transactions for and in behalf of Northside created bona fide debts. He concludes that the balance of his personal account shown on the corporate books at December 31, 1946, was the amount of his indebtedness to Northside. Respondent's position is that the unrestricted withdrawals of petitioner constituted distributions of dividends within the purview of section 115(a), I.R.C.[1]
*142 The issue presented is purely factual. Irving T. Bush, 45 B.T.A. 609; modified on another issue, 133 Fed. (2d) 1005. In his deficiency notice respondent refers to petitioner's transactions as "withdrawals." We do not think that the term "withdrawals" precisely describes his transactions. See Gorman Lumber Sales Co., 12 T.C. 1184. What actually happened was that petitioner retained the money he received upon the sale of Northside's lots. He then paid corporate taxes, maintenance and operating expenses out of his own pocket. The amounts retained from a sale were debited to his account on the corporate books. The amounts paid for and in behalf of Northside were credited to his account. Thus, these debits and credits to his account resulted from ordinary business transactions rather than withdrawals, as the term is commonly understood. The balance of this account at any time indicated the sums petitioner owed Northside, or the amount Northside owed him. An examination of a transcript of this account from the year 1938 through the years before us shows that petitioner's accountant was meticulous in making the entries. The credit entries range *143 from a seventeen cent credit for "Int. & Pen. on Taxes Pd" in 1938, to a $43,575.68 entry in 1944 for "S. A. [San Antonio] L & Trust Notes paid." The smallest debit was an entry of twenty cents for "Stat & Off Supplies (postage)" in 1940. The largest debit entry was $38,455.64 in 1939 for "Total Lot Purchases Per Detail JNL. Page." The balance in the account fluctuated from time to time, both as to amount and as to who was the debtor or creditor. At one time, February 29, 1944, the corporation owed petitioner $97,725.08. By the end of the year this debt had been reduced to $16,921.53. The record and petitioner's testimony unequivocably prove that there was a debtor-creditor relationship between him and Northside. While petitioner's fiscal policies would not be tolerated by other stockholders in a corporation where the stock was widely held, we can not, without legislative authority, correct the legitimate manipulation of his closely held corporation. It appears that petitioner's expenditures for, and receipts from Northside were in good faith. Further, there is no compelling reason why we should ignore the corporate entity. These facts eliminate a situation which lends itself to *144 the application of the substance versus form doctrine. The petitioner must be sustained. See Wiese v. Commissioner, 93 Fed. (2d) 921; affirming 35 B.T.A. 701; Rollin C. Reynolds, 44 B.T.A. 342; Gorman Lumber Sales Co., supra. Respondent on brief points out such facts as the absence of notes, the nonpayment of interest on indebtedness, and the failure to distribute corporate dividends. These elements mitigate against the petitioner but even considering these items we can not find that the transactions between petitioner and Northside created anything but a debtor-creditor relationship. Notes do not create an indebtedness but are only evidence of it. If petitioner incurred interest indebtedness it would have been offset in large measure by the interest accruing against Northside on its indebtedness to him. Since no dividends were declared in 1945 or 1946, respondent argues that petitioner had the use of Northside's money. But, on the other hand, for the years 1940 through 1944 when Northside was the debtor, it had the use of petitioner's money. There is no uniform pattern which shows that petitioner exclusively used the money of *145 Northside. Both petitioner and the corporation alternately enjoyed the use of the other's money for different periods. Because we found that a debtor-creditor relationship existed between petitioner and Northside, there is no need to discuss petitioner's alternate contention; however, since there were other adjustments in the deficiency notices not now before us, a Rule 50 computation will be necessary. Decisions will be entered under Rule 50. Footnotes
1. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. (a) Definition of Dividend. - The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *↩