Edwin J. O'Reilly and Cennith O'Reilly, et al. [1] v. Commissioner. O'Reilly v. Commissioner
Docket Nos. 6142-66-6144-66.
United States Tax Court
T.C. Memo 1968-291; 1968 Tax Ct. Memo LEXIS 9; 27 T.C.M. (CCH) 1543; T.C.M. (RIA) 68291; December 19, 1968, Filed Eugene J. Steiner, 90 State, Albany, N. Y. and Philip S. Caponera, for the petitioners. Robert M. Pearl, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' 1961 Federal income taxes in the following amounts: Petitioner
Docket No.
Amount
Edwin J. O'Reilly and Cen- nity O'Reilly
6142-66
$1,801.94
William J. O'Reilly and Gertrude E. O'Reilly
6143-66
$1,780.20
Leonard T. O'Reilly and Catherine O'Reilly
6144-66
$1,465.10
*10 1544 The sole issues presented for decision are: (1) Whether the payments by O'Reilly Stationery Co., Inc., to Mary V. Sheppard during 1961, stipulated as $2,256.38, [2] constitute constructive dividend distributions to petitioners in that year under section 316 (a), [3] (2) whether the purchase in 1961 of Charles O'Reilly's stock was a redemption of that stock within the meaning of section 317(b); and (3) if such purchase was not a redemption, whether petitioners' withdrawal of $20,000 from O'Reilly Stationery Co., Inc., in 1961 to pay for the stock represents a nontaxable bona fide loan or a distribution, under section 316(a), of a taxable dividend. Findings of Fact Some of the facts have been stipulated and are so found. The stipulation and exhibits thereto are incorporated herein by this reference. Petitioners Edwin J. O'Reilly and his wife Cennith O'Reilly, William J. O'Reilly and his wife Gertrude E. O'Reilly, and Leonard T. O'Reilly and his wife Catherine O'Reilly were all legal *11 residents of Kingston, New York, at the time of the filing of the petitions herein. Each couple filed a joint Federal income tax return for the year 1961 with the district director of internal revenue at Albany, New York. Edwin J. O'Reilly, William J. O'Reilly, and Leonard T. O'Reilly (hereinafter referred to as "petitioners") are brothers, and during 1961 were the sole officers and directors of O'Reilly Stationery Co., Inc. (hereinafter "Stationery") and of William J. O'Reilly, Inc. (hereinafter "O'Reilly, Inc."). On November 6, 1961, the stock of these corporations was held as follows: Shareholder
No. of Shares ofStationery
No. of Shares ofO'Reilly, Inc.
Edwin J. O'Reilly
17 1/2
125
William J. O'Reilly
17 1/2
125
Leonard T. O'Reilly
17 1/2
125
Charles O'Reilly
17 1/2
125
Mary F. O'Reilly [4]
30 Charles O'Reilly (hereinafter "Charles") is a brother of the petitioners; Mary F. O'Reilly is their mother. The four O'Reilly brothers each had acquired five shares of Stationery by gift from their father at the time *12 of its formation in 1938. Their father then owned 30 shares (which passed to Mary F. O'Reilly upon his death in 1938), and the remaining 50 shares were owned by Joseph H. Sheppard, the president of Stationery. On January 31, 1950, subsequent to the death of Sheppard, the four brothers entered into a contract to purchase Sheppard's 50 shares of Stationery stock from his widow, Mary V. Sheppard (hereinafter sometimes referred to as "Mary"). They each acquired 12 1/2 shares in exchange for their agreement to pay to Mary for the remainder of her life $30 per week and the real property taxes on her residence. All sums due to Mary under this contract were paid not by petitioners and Charles, but by Stationery. These expenditures were carried on that corporation's accounting records as "Accounts Receivable," which totaled $34,390.38 as of January 31, 1962. No payments to Stationery were ever made by petitioners or Charles with respect to these sums. During 1961, Stationery paid a total of $2,256.38 to Mary. The business affairs of Stationery and O'Reilly, Inc., were managed solely by petitioners. Charles neither participated in the management of, nor received any compensation from, either *13 corporation. No dividends had ever been declared or paid by Stationery. Sometime prior to November 6, 1961, a controversy arose between petitioners and Charles when the latter decided that since he was receiving no income from the businesses, he wanted to sell his stock. A proposed agreement (the parties to which were petitioners, Charles, and Stationery) was drafted, calling for Charles to sell his 17 1/2 shares of Stationery to said corporation "at the request of the [petitioners]." This proposed agreement was never executed. Subsequently another agreement was adopted, this time including O'Reilly, Inc., as a fourth party. Under this agreement, dated November 9, 1961, Charles agreed to transfer his 17 1/2 shares of Stationery and his 125 shares of O'Reilly, Inc., to petitioners in exchange for: (1) A cash payment of $20,000; (2) assumption by petitioners and Stationery of Charles' share of the obligation to Mary V. Sheppard under the contract of purchase dated January 31, 1545 1950; (3) an agreement by petitioners and O'Reilly, Inc., to continue a group life insurance policy on the life of Charles; (4) an agreement by petitioners and Stationery that if the latter should *14 adopt a group life insurance program for its officers, Charles would be made an officer of Stationery and included in the program; (5) an agreement by petitioners to elect Charles to the board of directors of O'Reilly, Inc., as assistant chairman and secretary; and (6) provisions obligating petitioners, Stationery, and O'Reilly, Inc., to hold Charles harmless from numerous contingent liabilities. In order to finance petitioners, purchase of Charles' stock, checks in the amount of $20,000 were drawn by Stationery to petitioners on November 6, 1961. In exchange for these checks, petitioners executed, on November 9, 1961, non-interest bearing unsecured demand notes payable to Stationery in the amount of $20,000. The advance was carried on Stationery's general ledger as "Officers' Loans Receivable." Petitioners deposited the checks from Stationery in their personal checking accounts, and then drew their personal checks totaling $20,000 to Charles in payment for his stock. New stock certificates of Stationery totaling 17 1/2 shares were filled out in the names of petitioners; but they were never countersigned by Stationery's secretary-treasurer as required by its bylaws, nor were they *15 delivered, because petitioners were advised by their attorney that Stationery, and not petitioners, should purchase the stock. Stationery never adopted a resolution acknowledging petitioners' purchase of the shares for its benefit. Stationery has never charged interest upon, nor demanded payment of, the withdrawn amounts. Petitioners have paid no interest on those amounts; nor have they made any payments in reduction therof. Nevertheless, although the account "Loans to stockholders" on Schedule L (balance sheet) of Stationery's corporation income tax returns for the fiscal years ending January 31, 1962, and January 31, 1963, has a balance of $20,000, that account has a zero balance on the schedules to the returns for the fiscal years ending January 31, 1964, and January 31, 1965. During 1961 Stationery's accumulated earnings and profits were in excess of $22,256.38. At the time of the purchase of Charles' stock by petitioners, O'Reilly, Inc., was in poor financial condition and did not have sufficient funds to redeem Charles' stock in that corporation. Ultimate Findings of Fact The sum of $2,256.38 paid by Stationery to Mary V.Sheppard during 1961 is a taxable dividend to *16 petitioners in that year. The purchase of Charles' stock on November 9, 1961, was not a redemption. The purchase was made by petitioners on their own behalf, not as agents for the corporations. The sum of $20,000 distributed by Stationery to the petitioners on November 6, 1961, and used to discharge their personal obligation to Charles, is a taxable dividend to petitioners in that year. Opinion This case presents the recurring question whether payments made by a corporation to or for the benefit of its shareholders should be treated as taxable dividend distributions to such shareholders under section 316(a). [5] The payments here in issue were made in two separate factual settings. *17 As to one group of payments - those made to Mary V. Sheppard by Stationery totaling $2,256.38 in 1961 - respondent's determination is not seriously challenged. The record is unmistakably clear that on January 31, 1950, petitioners and their brother Charles personally obligated themselves to pay Mary $30 per week and the real property taxes on her residence for the remainder of her life as consideration for the transfer to them of her 50 shares of Stationery stock. Petitioners' personal obligations to Mary under the agreement, including those in the years before the Court, have all been discharged through payments made by Stationery. This is a classic example of a constructive dividend, taxable to the 1546 shareholders under section 316(a). The payments must be treated as if they had been made to petitioners and then transmitted by them to Mary. Wall v. United States, 164 F. 2d 462, 464 (C.A. 4, 1947). The other payment presents a more difficult problem. It stems from an agreement dated November 9, 1961, relating to the transfer by Charles to petitioners of his 17 1/2 shares of Stationery stock and 125 shares of O'Reilly, Inc. stock in consideration of, among other *18 things, cash in the amount of $20,000. Stationery had paid $20,000 to petitioners, on November 6, 1961. We agree with respondent that this payment to petitioners also must be treated as a constructive dividend to them under section 316(a). To avoid constructive dividend treatment of the $20,000 payment, petitioners advance two mutually exclusive and inconsistent arguments as to the character of the payment: (1) That in substance, although admittedly not in form, Charles' stock was redeemed by Stationery and O'Reilly, Inc.; and (2) that the $20,000 payment represented a bona fide loan from Stationery to them, the proceeds of which were used to pay Charles for the stock. Although not presented as such, we will consider these arguments as having been made in the alternative and treat each one separately. The term "redemption" is defined in section 317(b), which provides that "stock shall be treated as redeemed by a corporationif the corporation acquires its stock from a shareholder in exchange for property." But the evidence is clear that Charles' stock was not acquired by Stationery and O'Reilly, Inc.; to the contrary, it was acquired by petitioners. The agreement of November 9, 1961, expressly *19 recites that Charles "agreed to sell to the First Party [i.e., petitioners]" his stock in the two corporations for $20,000. If the transaction had been a redemption by the corporations rather than a sale to petitioners as provided in the agreement, each corporation would have made its payment directly to Charles in exchange for the redeemed stock, but this did not occur. Instead, Stationery drew checks totaling $20,000 to petitioners, and petitioners then gave their personal checks totaling $20,000 to Charles. Petitioners each executed demand notes, bearing no interest, corresponding in amount to the checks which they received from Stationery; these notes were reflected on Stationery's books as "Officers' Loans Receivable" and on the balance sheets accompanying its income tax returns for the fiscal years ending January 31, 1962, and January 31, 1963, as "Loans to stockholders." The record does not show whether Charles endorsed his stock certificates to the corporations or to petitioners, but petitioners' failure to establish this obviously important evidentiary fact suggests that if shown the evidence would have been inconsistent with their present position. Cf. Wichita Terminal Elevator Co., 6 T.C. 1158, 1165 (1946), *20 affd. 162 F. 2d 513 (C.A. 10, 1947), and cases cited therein. Moreover, the November 9, 1961, agreement contained several provisions which are more consistent with a purchase and sale than with a redemption: (1) Assumption by petitioners and Stationery of Charles' share of the obligation to Mary V. Sheppard; (2) agreement by petitioners and O'Reilly, Inc., to continue a group life insurance policy on Charles; (3) an agreement that Charles would be made an officer of Stationery and insured if Stationery should adopt a group life insurance program for its officers; and (4) provisions obligating petitioners, Stationery, and O'Reilly, Inc., to hold Charles harmless from numerous contingent liabilities. Petitioners recognize that these facts, most of them undisputed, are inconsistent with their redemption theory. Nevertheless, petitioners maintain that after their attorney advised that the corporations, and not they, should purchase the stock, their initial intention to purchase the stock themselves changed; and that the agreement as finally carried out was in substance a redemption, with petitioners serving as "conduits" for the corporation. To substantiate this contention, *21 petitioners point to the fact that although new stock certificates, covering the 17 1/2 shares purchased from Charles, were prepared for issuance to them, such certificates were neither countersigned by Stationery's secretary-treasurer nor delivered. Yet issuance and physical delivery of stock certificates to a purchaser is not prerequisite to his ownership of the shares represented by such certificates. [6] See Wesley H. Morgan, 46 T.C. 878, 890 (1966). We think petitioners, the corporations, and Charles had traveled too far along the 1547 purchase-sale route to reverse their course and undo what they had already done. While we recognize that the business of small, closely-held corporations is often handled informally, we believe the statute requires that more be shown than the shareholders' mere unexpressed and elusive intent to undo the determinative transactions. Stationery took absolutely no action to ratify the purchase made by petitioners: if a redemption had been intended, it would have been a simple matter for Stationery to have adopted a *22 resolution acknowledging the purchase as its own. Similarly, while Stationery itself could not have redeemed the stock of O'Reilly, Inc., [7] Stationery could have canceled petitioners' debts for the portion of the $20,000 which was used to acquire its stock and treated only the sum used to purchase the O'Reilly, Inc. stock as a debt from its shareholders. Not only did Stationery fail to do any of these things, but, significantly, it failed to record on its books ownership of its own stock and of the O'Reilly, Inc. stock transferred by Charles. While the transaction could have been cast in the form of a redemption, it simply was not and we must view the tax consequences in the light of what was done, not what might have been done. Cf. United States v. Safety Car Heating Co., 297 U.S. 88, 98 (1936); John M. Rogers, 44 T.C. 126, 136 (1965), affd. 377 F. 2d 534 (C.A. 9, 1967).
Petitioners further contend that they received no individual economic or financial benefit from the transaction, and that therefore it must have been a redemption *23 by the corporation rather than a purchase by them. Even assuming that this conclusion necessarily follows from the premise put forth, we cannot agree with the premise. Petitioners received a substantial economic benefit from the transaction - they eliminated the one dissenting voice among the shareholders, with the result that they thereafter had unfettered control of the corporations' affairs. We do not think petitioners' original intention to purchase the stock for themselves ever changed. The record simply will not support a finding that either of the corporations "[acquired] its stock from a shareholder" within the meaning of section 317(b). Petitioners' reliance on Fox v. Harrison, 145 F. 2d 521 (C.A. 7, 1944), is misplaced. There the taxpayershareholder acquired the stock on behalf of the corporation with his own funds, because the corporation was unable to do so, and held it as a "temporary expedient" until the corporation could accumulate the funds needed to take the stock off his hands. 145 F. 2d at 522-523. The transaction was held to be a redemption.[8] In the instant case, by contrast, petitioners borrowed funds from Stationery to make the *24 purchase. Had a redemption been intended, Stationery could have transferred its funds directly to Charles. Thus, there was no reason here, as in Fox, compelling the purchase to be made with the shareholders' funds rather than those of the corporation. We next turn to the second of petitioners' arguments - that the $20,000 withdrawal was a loan by Stationery to them. The issue raised by this argument is a purely factual one. Wiese v. Commissioner, 93 F. 2d 921, 923 (C.A. 8, 1938), affirming 35 B.T.A. 701 (1937), certiorari denied 304 U.S. 562 (1938); William C. Baird, 25 T.C. 387, 393 (1955). We approach this issue bearing in mind that petitioners were in control of Stationery, and were thus in a position to manipulate its affairs so as to obtain the permanent use of corporate funds without a formal declaration of dividends. This factor invites our careful scrutiny. Elliott J. Roschuni, 29 T.C. 1193, 1202 (1958). We have concluded that the objective evidence will not support *25 a finding that the withdrawal was a loan. Petitioners each benefited from the withdrawal in proportion to their respective stock ownership, the same as if a dividend had been formally declared. While notes were given to evidence petitioners' alleged indebtedness to Stationery, the notes bore no interest and none was ever paid. The notes were not secured by any collateral. No repayments have been made on the alleged loan, and no evidence was offered to explain petitioners' failure to make repayments except that "the corporation was not in need of the funds." Indeed, we infer from this testimony that petitioners intended to "repay" only if Stationery needed the money; we note, however, that they might have been expected to advance funds to Stationery in any event if it was in financial difficulty. 1548
Although the corporate books and the balance sheets attached to the corporation's returns for the fiscal years 1961 and 1962 reflected the $20,000 as loans receivable, the balance sheets attached to the returns for fiscal years 1963 and 1964 did not. Rather, the balance sheets for these last two years reflected no amounts due from the stockholders. While it is true that the absence *26 of such bookkeeping entries for the latter two years is, by itself, evidentiary only and not determinative of tax liability, nevertheless it is highly persuasive that, at least as early as January 31, 1964, petitioners had abandoned any pretense that the $20,000 withdrawal was a loan. None of the cases cited by petitioners detracts from our conclusion. In Wiese v. Commissioner, supra, it was the petitioner, not the respondent, who argued that the withdrawals from his wholly owned corporation were dividends in the years of withdrawal, and we held that the petitioner had failed to carry his burden of proof. In Victor Shaken, 21 T.C. 785 (1954), it was proven that the petitioner was able to repay the loan at all times. In Rollin C. Reynolds, 44 B.T.A. 342 (1941), the petitioner paid interest on the withdrawals; he had the means to repay them; they were continuously carried on the corporate records as loans; and no comparable withdrawals were made by other shareholders. And in Al Goodman, Inc., 23 T.C. 288 (1954), the withdrawal was necessitated by an unusual, emergency situation, and was vital to the corporation's continued success; *27 the loan was formally discussed and approved at meetings of the board of directors, and was evidenced by an interest-bearing, secured note; interest payments and repayments of principal were actually made; and petitioner always had assets with which to repay the loan. Careful consideration of the entire history of this transaction leads us to conclude that petitioners never intended to repay Stationery. According to the undisputed testimony, the corporation had never paid a dividend. Indeed, this was one of the reasons for Charles' dissatisfaction as a shareholder. The corporation had started with capital of only $10,000 and its balance sheet for the year ended January 31, 1962, shows earned surplus of $80,074.23. As noted above, petitioners and Charles had contracted in 1950 to make payments to Mary V. Sheppard as consideration for the transfer of her stock to them, but petitioners had not made the payments. They had caused Stationery to make them, recording the payments in the corporate books in an account entitled "Accounts Receivable," which totaled $34,390.38 as of January 31, 1962. We believe a similar procedure was planned as to the $20,000. Initially, petitioners set about *28 to document the withdrawal as a loan. Then they were advised that they should have documented it as a redemption and they reversed some of the entries. We think its true character was that of a taxable dividend. Decisions will be entered under Rule 50. Footnotes
1. The proceedings of the following petitioners are consolidated herewith: William J. O'Reilly and Gertrude E. O'Reilly, Docket No. 6143-66, and Leonard T. O'Reilly and Catherine O'Reilly, Docket No. 6144-66.↩
2. The notices of deficiency herein originally set this figure at $2,605.23. ↩
3. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
4. Upon the death of Mary F. O'Reilly in October 1963, her 30 shares of Stationery stock passed to petitioner Edwin J. O'Reilly.↩
5. SEC. 316. DIVIDEND DEFINED. (a) General Rule. - For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders - (1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *↩
6. This is especially true in a closely-held corporation where, as here, the purchaser is already a shareholder.↩
7. We have found as a fact that O'Reilly, Inc., did not have the resources with which to effect a redemption.↩
8. To the same effect is William A. Green [Dec. 26,302(M)], T.C. Memo. 1963-248↩, also extensively relied on by petitioners.